**MORAINE PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Wyoming–California Pipeline Company, Wisconsin Natural Gas Company, Intervenors.**

**No. 88–1849.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1990.
Decided June 22, 1990.

Philip R. Telleen, with whom Paul E. Goldstein and Paul Korman, were on the brief, for petitioner.

Katherine Waldbauer, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Solicitor, F.E.R.C., were on the brief, for respondent.

Bruce F. Kiely and Jane G. Adams were on the brief, for intervenor Wisconsin Natural Gas Co.

Bernard A. Foster III, G. William Stafford, Daniel F. Collins, and G. Mark Cook entered appearances, for intervenor Wyoming–California Pipeline Co.

Before SILBERMAN, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge SILBERMAN.

BUCKLEY, Circuit Judge:

Moraine Pipeline Company petitions for review of Federal Energy Regulatory Commission orders granting Moraine an optional expedited certificate to construct and operate a natural gas pipeline. The sole issue presented is whether FERC properly conditioned the certificate on the requirement that Moraine base its rates on an annual throughput of 54.7 billion cubic feet ("bcf"). We conclude that even under the expedited procedures elected by Moraine, the Commission failed adequately to address Moraine's argument that its effective capacity is in fact significantly less than 54.7 bcf per year.

## I. BACKGROUND

### A. Regulatory Background

Under section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f (1982), natural gas companies seeking to construct new facilities or offer new transportation or sales service must obtain certificates of public convenience and necessity authorizing such acts. As we have previously observed, standard section 7 certification proceedings can be time consuming, cumbersome, and costly; moreover, they may "stifle[ ] the sort of quick responsiveness to demand that is associated with competition." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1030–31 (D.C.Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988).

In Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified in scattered sections of 18 C.F.R.), *vacated and remanded in part*, *Associated Gas Distribs.*, 824 F.2d 981, the Commission created an optional expedited certificate ("OEC") procedure, an expedited method of obtaining certificates of public convenience and necessity for pipelines seeking to provide new services. *See* 18 C.F.R. §§ 157.100–.106 (1989). The availability of this streamlined certification alternative was expected to stimulate competition and enhance consumers' access to alternative sources of gas. *See Associated Gas Distribs.*, 824 F.2d at 1030; *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, [Reg.Preambles )82–1985] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,665, at 31,569–70 (1985) ("Regulations Preambles").

To qualify for an OEC, a pipeline must meet certain requirements designed by the Commission to ensure that the applicant assumes the entire economic risk of the proposed service. *See* Regulations Preambles at 31,569, 31,576–78; 18 C.F.R. § 157.103(d); *Associated Gas Distribs.*, 824 F.2d at 1030. As the Commission explained in adopting the OEC procedures,

"an essential aspect of [the OEC] rule is the principle of accountability in the more competitive environment. Applicants must be willing to assume the full responsibility of their ventures in order to qualify for the expedited procedures." Regulations Preambles at 31,576.

Specifically, the regulations adopt four rate principles which ensure that applicants bear the full risk of their ventures; they are summarized by the Commission in its Regulations Preambles as follows:

First, rates for new services are required to be volumetric [with one exception]. Secondly, only properly allocated costs may be included in the rates for new service. Third, applicants may not reduce projected volumes in future rate cases. Finally, pipelines may not recover past losses in future rate cases.

Regulations Preambles at 31,576; *see* 18 C.F.R. § 157.103(d). The risks entailed by an OEC "provide a pipeline with a strong incentive not to include excess capacity in new facilities constructed under an expedited certificate." Regulations Preambles at 31,578.

An applicant who complies with the OEC requirements is entitled to a rebuttable presumption that it satisfies the statutory prerequisites for certification, and the application, if not contested by a protest raising a genuine issue of material fact, may receive expedited consideration. *See* 18 C.F.R. § 157.104(b), (c).

## B. Factual Background

In May 1986, pursuant to section 7 of the NGA and the OEC regulations, Moraine filed an application for authority to construct and operate a 17.8–mile natural gas pipeline connecting the facilities of the Natural Gas Pipeline Company of America ("Natural") near Grayslake, Lake County, Illinois, with those of Wisconsin Natural Gas Company ("Wisconsin Natural") in Kenosha County, Wisconsin. Moraine also proposed to provide interruptible transportation of up to 90 billion Btus per day, which (depending on the heat content of the gas) is roughly equivalent to 90 million cubic feet of natural gas per day. At the same time, Moraine applied for a blanket certificate to operate as an "open-access transporter" of gas pursuant to Order No. 436. Moraine has no other delivery points, no storage or compression capabilities, and it makes no sales.

In February 1988, the Commission issued an order granting Moraine an OEC to construct the pipeline and a blanket transportation certificate. 42 F.E.R.C. ¶ 61,144 (1988) ("Initial Order"). The Commission conditioned the OEC on a requirement that Moraine base its rates on a throughput of 54.7 billion cubic feet ("bcf") per annum, an average of 150,000 thousand cubic feet ("mcf") per day. *Id.* at 61,543. The Commission's concern was that Moraine's proposed rates, which were based on a projected annual volume of only 15 bcf, would enable Moraine to substantially overrecover its costs and to shift the risk of underutilization of its facilities to its customers in violation of the optional certificate regulations. Initial Order at 61,542. The Commission therefore required Moraine to base its rates on what it considered to be Moraine's full pipeline capacity of 54.7 bcf per year. *Id.* at 61,543.

To explain the issue more clearly, under an OEC a pipeline must recover its costs based on its projected volume. The higher the pipeline's projected volume, the lower its per unit charge must be. Thus if, as the Commission feared, Moraine were in fact able to transport *more* gas than its projected volume, it could recover *more* than its costs, at the expense of its customers. If, on the other hand, Moraine in fact had a lower capacity than that projected by FERC, it would be unable to recoup its costs even if its system were fully utilized.

Moraine applied for rehearing, challenging the Commission's throughput assumptions and submitting evidence in support of its claim that its effective capacity was 90,000 mcf per day rather than the 150,000 mcf average assumed by FERC. In response, the Commission convened a technical conference to consider Moraine's capacity, instructed its staff to prepare a report, and requested additional information from the parties. 43 F.E.R.C. ¶ 61,118 (1988).

On October 3, 1988, the Commission denied rehearing on the capacity issue. 45 F.E.R.C. ¶ 61,005 (1988) ("Order Denying Rehearing"). The Commission first concluded that Moraine had failed to demonstrate that its rates should be designed to reflect an annual throughput of less than 54.7 bcf because "[i]t seems indisputable that Moraine has the physical ability to receive and transport this amount." Order Denying Rehearing at 61,023. On the assumption that 54.7 bcf was an attainable throughput, the Commission refused to modify that condition because

> [i]f Moraine's rates are based on capacity or throughput projections that are too low, the potential exists that Moraine's customers will pay more than the properly allocated costs of service. This would reduce Moraine's incentive to seek additional load if its system is underutilized, and create the potential for overrecovery if the system is fully utilized. The cost allocation and volumetric rate conditions are intended to create an incentive for optional certificate applicants to propose optimally sized facilities that will not be underutilized.

*Id.* This petition followed.

## II. Discussion

We begin by emphasizing, as the Commission does, that the requirements for an expedited certificate are in both substance and procedure different from those of a regular certificate. At the risk of belaboring the obvious, we also emphasize that the expedited procedures are *optional.* As the Commission explained at the time of their adoption,

> [t]o qualify [for an OEC], the applicant must agree to comply with the specific terms and conditions under which the certificate is offered. Most important, the applicant must accept the full risk of the proposed venture. These procedures are completely voluntary. The alternative of applying for a certificate under conventional procedures remains available, with the conventional assignment of risks.

Regulations Preambles at 31,569.

In the case before us, Moraine itself chose the OEC route, presumably because of the accompanying benefits of expedited consideration based on a rebuttable presumption in favor of certification. To the extent Moraine was dissatisfied with either the certification conditions imposed by the Commission or the adequacy of the Commission's consideration of its application, it could have opted for a standard section 7 proceeding, including a full hearing. Because Moraine tried to secure the benefits of an OEC, however, we hesitate to let Moraine also eat its cake by entertaining challenges to FERC's disposition of Moraine's application. Nevertheless, we cannot absolve the Commission of its fundamental obligation to engage in reasoned decisionmaking.

The sole error alleged by Moraine is the Commission's conclusion that Moraine has an annual throughput capacity of 54.7 bcf. In calculating that figure, the Commission recognized that as Moraine would not have any compression facilities of its own, its throughput capacity would depend on the pressure at which gas would be delivered to it by Natural. The Commission assumed a pressure of 424 pounds per square inch gauge ("psig") at the interconnection of Natural and Moraine. Given the 20-inch diameter proposed by Moraine, the Commission concluded that 424 psig pressure would allow the pipeline to transport an average of 150,000 mcf per day, which translates to 54.7 bcf per year. Initial Order at 61,538, 61,543; Order Denying Rehearing at 61,022.

In its application for rehearing, Moraine challenged the Commission's conclusion, asserting that the pipeline's effective capacity was only 90,000 mcf per day. Moraine contended that although the 424 psig pressure accurately reflected Natural's then-current peak day operations, the pressure at the interconnection would drop when Moraine began taking gas from Natural's system; thus Moraine's effective capacity would be less than that assumed by the Commission. Moraine also defended the pipeline's 20-inch design as necessary in order to reliably deliver the contractual vol-

ume of 90,000 mcf per day during a Wisconsin winter, presumably because of the effects of periods of severe cold on pipeline throughput. Finally, Moraine submitted data purporting to show that on 241 days of the year, it would be unable to transport the 150,000 mcf necessary to achieve FERC's projected annual level of 54.7 bcf.

While the Commission acknowledged these arguments, it failed to address them. Instead, it merely asserted that

> petitioners have not demonstrated that we should change our condition that Moraine's rates be designed to reflect an annual throughput capability of 54.7 Bcf. It seems indisputable that Moraine has the physical ability to receive and transport this amount.

Order Denying Rehearing at 61,023. FERC made no attempt to refute Moraine's arguments, nor did it specify the evidence on which it based its "indisputable" conclusion regarding Moraine's capacity. *See* Order Denying Rehearing at 61,022–23. Instead, the Commission focused only on the risk that Moraine might overrecover its costs contrary to the purposes of the OEC program, to the exclusion of any substantive technical analysis. Thus, by failing to respond to Moraine's arguments and to articulate its decision based on evidence in the record, the Commission breached its obligation to engage in reasoned decision-making. *See Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 445 (D.C.Cir.1988); *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C.Cir.1981).

On remand, the Commission should address two points raised by Moraine. First, FERC should respond to Moraine's argument that a 20–inch pipeline is necessary in order to reliably deliver 90,000 mcf per day during a Wisconsin winter. Conversely, the Commission should address Moraine's contention that it could not deliver 150,000 mcf per day during much of the year. Second, the Commission should discuss Moraine's claim that the pressure at the Natural–Moraine interconnection will in fact be less than 424 psig. In this regard, we note that in its Order Denying Rehearing, the Commission appears to suggest that 424

psig is attainable because of "some compression facilities [presumably belonging to Natural] that were and will be available on non-peak days," which Moraine apparently did not take into consideration. *See* Order Denying Rehearing at 61,023 n. 4. If this is its basis for rejecting Moraine's position, it not only should say so explicitly but should respond to Moraine's counter-argument that Natural is under no obligation to operate its compression facilities for Moraine's benefit.

In challenging the Commission's capacity assumption, Moraine also asserted that Wisconsin Natural (Moraine's sole customer) is physically unable to receive 54.7 bcf of gas per year. Wisconsin Natural's ability to take gas, however, is irrelevant to the issue of Moraine's capacity. As an OEC holder, Moraine alone must assume all the economic risks of the pipeline it has built— including the risk that it built too large a pipeline. *See Associated Gas Distribs.*, 824 F.2d at 1030; Regulations Preambles at 31,569. If Moraine in fact has the physical capacity to transport the volume of gas projected by the Commission, then the limitation on rates imposed by FERC must be upheld. As the Commission explained in its Initial Order,

> we do not believe it is appropriate, under the optional procedures, to allow a company to recover the entire cost of building and operating a pipeline and a reasonable rate of return on the project regardless of whether the pipeline is underutilized. This is so because the optional applicant has sole discretion to determine the size, location, and type of facilities to be utilized. Underutilization is a risk that the Commission contemplated would be placed on the optional certificate holder.

Initial Order at 61,542.

### III. CONCLUSION

Because the Commission failed adequately to address certain of Moraine's arguments regarding its effective capacity, we grant the petition for review and remand for further proceedings.

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I completely agree with my colleague's excellent opinion, but very much doubt that, even though petitioner gained a remand, it will turn out to have been worth it to bring this rather insignificant issue to our court.