965 F.2d 1066
 296 U.S.App.D.C. 104
 NATURAL GAS CLEARINGHOUSE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Anadarko Petroleum Corporation, Chevron U.S.A. Inc.,
Panhandle Trading Company, Tarpon Transmission
Company, Tejas Power Corporation,
Trunkline Gas Company, Texican
Natural Gas Company,
Intervenors.
TRUNKLINE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tarpon Transmission Company, Anadarko Petroleum Corporation,
Chevron U.S.A. Inc., Natural Gas Clearinghouse,
Tejas Power Corporation, Intervenors.
TEXICAN NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tarpon Transmission Company, Trunkline Gas Company,
Panhandle Trading Company, Tejas Power
Corporation, Natural Gas Clearinghouse,
Intervenors.
TRUNKLINE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
NATURAL GAS CLEARINGHOUSE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
TRUNKLINE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 90-1367, 90-1419, 90-1489, 90-1554, 90-1583, 90-1585.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 20, 1992.
Decided May 22, 1992.
 
 [296 U.S.App.D.C. 105] On Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Brian D. O'Neill, with whom Bruce W. Neely, Washington, D.C., Frank R. Lindh, San Francisco, Cal., Merlin E. Remmenga and John C. Tweed, Houston, Tex., were on the brief for petitioner Trunkline Gas Co. in Nos. 90-1419, 90-1554 and 90-1585, and intervenors in Nos. 90-1367, 90-1489 and 90-1583. Keith T. Sampson, Washington, D.C., and Paul Biancardi, Houston, Tex., also entered appearances for petitioner.
 Peter G. Esposito, with whom John Wyeth Griggs and Thomas L. Albert, Washington, D.C., were on the joint brief for petitioners Natural Gas Clearinghouse, Texican Natural Gas Co. and Tejas Power Corp. in Nos. 90-1367, 90-1489 and 90-1583, and intervenors in Nos. 90-1419, 90-1489, 90-1554, 90-1583 and 90-1585.
 Joel M. Cockrell, Attorney, F.E.R.C., with whom William S. Scherman, General Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., Washington, D.C., were on the brief for respondent in all cases.
 Eugene R. Elrod, with whom Ronald S. Flagg, Richard E. Young and Nancy Y. Gorman, Washington, D.C., were on the brief for intervenor Tarpon Transmission Co. in Nos. 90-1367, 90-1419, 90-1489, 90-1554, 90-1583 and 90-1585. Gene C. Schaerr, Washington, D.C., also entered an appearance for intervenor.
 Mark R. Haskell, Gordon Gooch, Washington, D.C., J. Stephen Martin and Gerald P. Thurmond, Houston, Tex., entered appearances for intervenors Anadarko Petroleum Corp. and Chevron U.S.A. Inc. in Nos. 90-1367 and 90-1419.
 Brian D. O'Neill, Bruce W. Neely and Keith T. Sampson, Washington, D.C., entered appearances for intervenor Panhandle Trading Co. in Nos. 90-1367, 90-1489 and 90-1583.
 Before WALD, HARRY T. EDWARDS and STEPHEN F. WILLIAMS, Circuit Judges.
 Opinion for the Court PER CURIAM.*
 
 PER CURIAM:
 
 1
 We review two separate orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") arising out of a protracted ratemaking dispute. The first involves Tarpon Transmission Company, a natural gas pipeline company, and Trunkline Gas Company, Tarpon's primary shipper. In a previous decision, this court found that a FERC order interpreting in Trunkline's favor a crucial "Rate Adjustment" provision of the contract between Tarpon and Trunkline, did not qualify as "reasoned decisionmaking." See Tarpon Transmission Co. v. FERC, 860 F.2d 439 (D.C.Cir.1988). On remand, the Commission reconsidered the issue and this time arrived at a different conclusion endorsing the interpretation advanced by Tarpon. Trunkline challenges this FERC decision on the ground that yet again the FERC has [296 U.S.App.D.C. 106] failed to employ "reasoned decisionmaking."
 
 
 2
 The second order involves a dispute between Tarpon and parties who were not involved in the prior litigation. Several of Tarpon's open-access customers, natural gas marketeers, purchased transport service from Tarpon during the period when the FERC's original order governed Tarpon's open-access rate. The Commission's decision on remand to adopt Tarpon's interpretation of the rate adjustment provision results in a significantly higher rate for those customers. In order to rectify its error, the FERC has imposed a retroactive surcharge upon these open-access users, ordering them to make a lump sum payment to Tarpon, based upon the volume of gas they shipped on Tarpon's pipeline between 1988 and 1990. These petitioners argue that (1) the FERC has no authority to impose a retroactive surcharge based on past use, and (2) the FERC's order applying the surcharge in any case violates the filed rate doctrine because Tarpon and the FERC failed to provide adequate notice of the provisional nature of the approved lower rate at which they bought service from Tarpon.
 
 
 3
 Finding no merit in petitioners' claims, we deny both petitions for review. We discuss the two orders separately below.
 
 I. TRUNKLINE CONTRACT DISPUTE
 A. Background
 
 4
 Tarpon owns 40.4 miles of pipeline located off the Louisiana shore in the Outer Continental Shelf. Tarpon's pipeline connects natural gas reserves owned by Trunkline with Trunkline's own offshore pipeline. Trunkline has been Tarpon's principal customer since Tarpon began transporting natural gas in June 1978.[1]
 
 
 5
 A Transportation Agreement ("Agreement"), effective February 15, 1977 to July 1, 1991, specified the terms of the relationship between Tarpon and Trunkline and, as subsequently amended, served as Tarpon's Tariff with the Commission. In 1984 Tarpon filed a notice of proposed rate change under § 4 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717c, lowering its then-effective rate for transportation from 18.10 cents per Mcf, a rate established by settlement of an earlier rate case, to 16.88 cents per Mcf. The FERC accepted Tarpon's rate filing, subject to refund if Tarpon could not prove the rate was just and reasonable in a later rate proceeding, and set the matter for hearing. See Tarpon Transmission Co., 28 F.E.R.C. p 61,027 (1984).
 
 
 6
 At the hearing before an Administrative Law Judge ("ALJ"), Trunkline disputed the appropriate interpretation of § 10.5 of the Agreement, which provides for adjustments to Tarpon's rates at certain stated intervals.[2] Section 10.5 provides that "rate determinations shall be based upon a cost of service for the entire life of the reserves transported and to be transported ..., taking into consideration actual revenues collected to date." Under Tarpon's proposed interpretation, as supported by witness Frank S. McGee, Tarpon's Executive Vice[296 U.S.App.D.C. 107] President and a participant in the negotiation leading to the Agreement,[3] all costs of service, including the depreciation rate applied to its capital investments, are periodically recalculated so as to approximate the agreement that the parties would have reached at the outset with perfect information about the future. This retrospective recalculation of the rate of depreciation over the entire life of reserves takes into account the extended life of the reserves--at the time of the recalculation an estimated 21 years--rather than the initial estimate of 8 years. The new (and slower) rate of depreciation derived from the longer lifetime is then applied to the reserves yet to be delivered, with the result being an increase in the aggregate dollars to be collected as a return on underpreciated rate base.[4]
 
 
 7
 Trunkline countered with a contrary view of the meaning of § 10.5. According to Trunkline, the proper interpretation of § 10.5 required that the parties first determine the amount of depreciation already "booked" by Tarpon under its previous rates of depreciation; that amount then must be subtracted from the total allowable depreciation so that only depreciation not yet taken by Tarpon would be calculated according to the new reserve estimate.
 
 
 8
 The ALJ noted that Tarpon's method of determining depreciation expense was a novel departure from traditional ratemaking methodology, but he nonetheless accepted that interpretation as representing the parties' intent, and found that Tarpon should be authorized to recalculate retrospectively its depreciation expense in adjusting its future rate. Tarpon Transmission Co., 32 F.E.R.C. p 63,020 at 65,060 (1985). The Commission, however, disagreed with the ALJ's decision. Tarpon Transmission Co., 41 F.E.R.C. p 61,044 (1987). The Commission found that the appropriate interpretation of § 10.5 required the parties to recalculate only some expenses, such as fuel and labor costs, that had been initially estimated incorrectly, and that it was not intended to apply to depreciation expense. Id. at 61,136.
 
 
 9
 On review of the FERC's order, this court found that none of the explanations offered by the Commission for its rejection of the ALJ's interpretation of § 10.5 reached the level of "reasoned decisionmaking." Tarpon Transmission Co., 860 F.2d at 444. While not mandating a particular result on remand, we stated that at that juncture Tarpon's view, which had been accepted by the ALJ, represented the only "reasoned interpretation" of § 10.5. Id. at 445-46.
 
 
 10
 Following remand, the parties filed rounds of motions and briefs. As before, the dispute between the parties focused upon the proper depreciation methodology envisioned by § 10.5. This time, however, the FERC adopted Tarpon's interpretation of the rate adjustment provision. Tarpon Transmission Co., 51 F.E.R.C. p 61,042 (1990).[5] The FERC also held that Tarpon's [296 U.S.App.D.C. 108] rate adjusted under its new interpretation of § 10.5 (16.88 cents per Mcf) was "just and reasonable as filed." Tarpon Transmission Co., 51 F.E.R.C. p 61,310 (1990).
 
 B. Discussion
 1. Standard of Review
 
 11
 "Congress explicitly delegated to FERC broad powers over ratemaking, including the power to analyze relevant contracts." See Tarpon Transmission Co., 860 F.2d at 441-42 (quoting National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1569 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987)). There is no doubt that the Commission has greater technical expertise than we do in resolving complex ratemaking disputes, see Southern California Edison Co. v. FERC, 805 F.2d 1068, 1072 (D.C.Cir.1986). We therefore apply substantial deference to the FERC's interpretation of Tarpon's tariff. Accord Cajun Electric Power Cooperative, Inc. v. FERC, 924 F.2d 1132, 1135 (D.C.Cir.1991).
 
 
 12
 Notwithstanding deference due the agency,
 
 
 13
 [C]ourts still play a vital role in reviewing an agency interpretation of a technical contract provision. To fulfill that role, this court must ask whether the interpretation is "amply supported both factually and legally." We cannot accept an agency determination unless it is the result of reasoned and principled decisionmaking that can be ascertained from the record. To do otherwise would transform judicial review into a process of rubberstamping unsupported, and perhaps unsupportable, agency decisions.
 
 
 14
 Tarpon, 860 F.2d at 442 (quoting Vermont Dep't of Pub. Serv. v. FERC, 817 F.2d 127, 134 (D.C.Cir.1987)).
 
 
 15
 2. Did the FERC Engage in "Reasoned" Decisionmaking?
 
 
 16
 In reaching its decision on the meaning of § 10.5, the FERC considered primarily the text of that section, which (1) authorizes either party to request that the unit rate being utilized to determine the monthly charge "be decreased or increased to reflect changes in costs and/or gas reserves connected to the system"; (2) provides in lieu of the FERC's traditional test-year methodology[6] that such rate redetermination "shall be based upon a cost of service for the entire life of the reserves transported and to be transported ... taking into consideration actual revenues collected to date or to be collected prior to the effective date of such unit rate change"; and (3) states that the redetermined rate "shall be calculated in the same manner as used in the calculation of the initial unit rate hereunder." The Commission reasoned that although this section does not explicitly specify depreciation as its target, it does not name any other cost of service term (such as labor expense), and so there is nothing in the text to suggest that depreciation expenses should not be adjusted in the same manner as other expenses. The FERC concluded that the parties intended in § 10.5 to require retrospective recalculation of the depreciation rate as Tarpon had advocated all along.[7]
 
 
 17
 In our prior decision we acknowledged that the FERC's current interpretation of § 10.5 is reasonable as grounded in a coherent theory set forth in the testimony of Tarpon's witness McGee, who participated in its negotiation, see Tarpon, 860 F.2d at 445-46. Nothing in the record on the remand persuades us to change that view.
 
 
 18
 Trunkline, however, alleges several faults in the route by which the Commission [296 U.S.App.D.C. 109] reached its decision.[8] First, it argues that the FERC summarily adopted this court's reasoning in Tarpon, misconstruing our decision as mandating a particular substantive outcome. Our review of the record, however, assures us that the Commission did not simply put on blinders, but rather considered fully Trunkline's evidence and arguments. The FERC explicitly stated that in its view, this court's decision in Tarpon left it free to exercise independent judgment to resolve the interpretation question, and that it was "not foreclose[d] from adhering to its original interpretation." Tarpon, 51 F.E.R.C. at p 61,042. Trunkline offers nothing to convince us otherwise.
 
 
 19
 Second, Trunkline contends that the Commission failed to give proper consideration, and due credence, to an affidavit submitted as "evidence" by J.T. Kennedy, a former Trunkline officer. The Kennedy affidavit essentially restated the same arguments made by Trunkline in the initial proceeding supporting its interpretation of the contract. Contrary to Trunkline's assertion, the record amply demonstrates that the Commission did take the Kennedy statement into account during its deliberations. The FERC viewed the Kennedy statement as "one possible interpretation" of § 10.5, but ultimately found Tarpon's interpretation more persuasive. We can hardly say that the FERC's decision was unreasonable. Even if Kennedy's testimonial "evidence" could be squared with the language of the contract and the findings of the ALJ, Trunkline's was at best a competing reasonable interpretation, not the compelling one needed to prevail in this petition.
 
 
 20
 Finally, Trunkline points to a recent FERC decision in a § 5 proceeding involving the same parties--Tarpon and Trunkline--as support for its argument that the FERC's decision is "unprincipled." See Tarpon Transmission Co., 57 F.E.R.C. p 61,371 (1991). At the time the Commission approved the use of Tarpon's method to recalculate its depreciation rate under § 10.5, it also initiated an investigation under § 5 of the NGA to determine whether continuation of that method after 1988 would be just and reasonable. In that § 5 proceeding, the Commission ultimately determined that the parties had not intended the method established in § 10.5 to apply beyond 1988. Trunkline now asserts that the Commission's § 5 decision contradicts and highlights the patent deficiencies of the order under review. We reject the logic of that argument. The § 5 proceeding dealt only with the question of whether the rate redetermination method established in § 10.5 should continue to be used beyond a specific date; it did not purport to reconsider what methodology § 10.5 provided for in the first instance. We perceive no inconsistency in the outcome of the two proceedings; the FERC's latest interpretation § 10.5 is reasonable and amply supported by the record.
 
 II. OPEN-ACCESS SHIPPER DISPUTE
 
 21
 We also review an order arising from a dispute between Tarpon and two of Tarpon's open-access customers, Natural Gas Clearinghouse and Texican Natural Gas Company, that purchased transport service from Tarpon during the period when the FERC's original order in the Trunkline proceeding governed Tarpon's open-access rate. The Commission's decision on remand to adopt Tarpon's interpretation of the rate adjustment provision logically affects its prior decision not to approve Tarpon's significantly higher open-access rate based on the cost of service determined under the old interpretation of the Agreement. Asserting its discretionary authority to rectify that error now, the FERC has imposed a retroactive surcharge upon Tarpon's open-access users, ordering these customers to make recoupment payments to Tarpon, based upon the volume of gas they shipped from 1988 to 1990 and what they should have paid under the rate originally [296 U.S.App.D.C. 110] filed by Tarpon and erroneously disapproved by the Commission. These open-access customers reply that (1) the FERC does not have authority under the NGA to impose such a retroactive surcharge over and above the rate approved at the time of their purchase, and (2) the FERC's order violates the filed rate doctrine.
 
 A. Background
 
 22
 Prior to 1988, Tarpon shipped gas on its pipeline exclusively for Trunkline. In November 1987, Tarpon filed with the FERC tariff sheets necessary to allow it to provide open-access shipping to third parties other than Trunkline, and establish interruptible transportation rate schedules under the Commission's open-access regulations. See 18 C.F.R. § 284. Tarpon also filed an application for a blanket transportation certificate so that it would have authority to provide self-implementing transportation service under the regulations. See 18 C.F.R. § 284(G). Upon receiving the FERC's approval of its certificate and rate schedules, Tarpon was authorized to provide open-access transportation service directly to third-party shippers.
 
 
 23
 In its open-access rate filing, Tarpon proposed to charge the same maximum rate for the open-access users' interruptible transportation service--16.88 cents per Mcf[9]--as it had originally proposed to charge under Trunkline's separate rate schedule. See Tarpon Transmission Co., 41 F.E.R.C. at p 61,044. The Commission accepted Tarpon's open-access filing, but made the rate "subject to" the ongoing rate proceeding with Trunkline, discussed supra at 1068-70.[10]
 
 
 24
 As a result of the first round of the Trunkline proceedings before the Commission, the FERC rejected Tarpon's proposed rate of 16.88 cents per Mcf, and approved a rate of 4.02 cents per Mcf. Consistent with its earlier linkage of the open-access rate to the Trunkline rate, the Commission required Tarpon to file revised tariff sheets setting forth a maximum 4.02 cents per Mcf rate for its open-access users. See Tarpon, 42 F.E.R.C. p 61,274.
 
 
 25
 A number of spot-market shippers, including petitioners Natural Gas Clearinghouse and Texican, executed interruptible service contracts with Tarpon after the revised open-access tariff sheets listed 4.02 cents per Mcf as the maximum rate. Those contracts, and Tarpon's open-access tariff sheets, also contained the following provision:
 
 
 26
 Tarpon reserves all its rights and remedies with respect to the collection of this rate, including (but not limited to) to right to seek a surcharge to the rate in the event FERC Opinion No. 287 [Trunkline rate proceeding], issued October 20, 1987, in Docket No. RP84-82, et al. is overturned in Tarpon Transmission Co. v. FERC, 860 F.2d 439 (D.C.Cir.1988).
 
 
 27
 Natural Gas Clearinghouse and Texican shipped large volumes of gas on Tarpon's pipeline at the 4.02 cents rate while the case was on appeal. Neither petitioner (nor apparently any other open-access shipper) [296 U.S.App.D.C. 111] attempted to share the risk with Tarpon by negotiating for a rate somewhere between the 4.02 cents rate then on file and the 16.88 cents maximum Tarpon originally sought, in order to guard against the event that Tarpon ultimately would prevail in its litigation.
 
 
 28
 As discussed earlier, Tarpon did prevail in its appeal of the FERC's order to this court; we held that the Commission failed to adequately explain its decision rejecting Tarpon's interpretation of § 10.5 of the Trunkline contract which would have justified a 16.88 cents rate. See Tarpon, 860 F.2d at 439. On remand the Commission adopted Tarpon's position, which we now sustain, see supra at 108-09. The Commission invited Tarpon to file tariff sheets proposing a method to collect the amounts it would have charged but for the FERC's earlier error. See Tarpon, 51 F.E.R.C. at p 61,087.
 
 
 29
 Tarpon proposed to directly bill its open-access shippers lump-sum amounts.[11] Its tariff listed the "recoupment amounts" owed by all of its shippers, which were calculated by applying a 12.86 cents per Mcf surcharge (16.88 cents minus the previously approved rate of 4.02 cents) to every Mcf of gas that Tarpon had transported for those shippers between 1988 and 1990. The Commission accepted Tarpon's tariff sheet, and ordered the open-access shippers to make the recoupment payments. Natural Gas Clearinghouse and Texican contest that order.
 
 B. Discussion
 1. FERC's Remedial Authority
 
 30
 As an initial matter, we address the shippers' contentions that the FERC's discretionary remedial authority does not extend to ordering the payment of retroactive surcharges under the circumstances just detailed. In short, is there a statutory basis for the "broad discretion" the FERC asserts "to undo what has been wrongfully done by virtue of an order that has been upset on judicial review"? See Tarpon, 51 F.E.R.C. at p 61,087.
 
 
 31
 The Supreme Court appears to have answered that question in the affirmative, in United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965), opining that "an agency, like a court, can undo what is wrongfully done by virtue of its [prior] order." Natural Gas Clearinghouse and Texican attempt to distinguish Callery on the ground that it involved retroactive refunds to purchasers, rather than retroactive surcharges upon them. But we find no such limitation upon the Callery principle. Admittedly, certain provisions of the NGA reflect "a statutory bias in favor of retroactive rate reductions but not retroactive rate increases." Gillring Oil Co. v. FERC, 566 F.2d 1323, 1325 (5th Cir.1978). For example, § 4(e) of the NGA authorizes the FERC to order refunds if a rate increase which goes into effect after a five-month suspension period is later determined to be excessive, see 15 U.S.C. § 717c(e); it does not give the FERC symmetrical authority to order retroactive surcharges for the five-month suspension period before a rate later determined to be just and reasonable is allowed to go into effect.[12] This bias in the NGA in favor of refunds and against retroactive surcharges, however, invokes the FERC's more limited authority in § 4 proceedings to suspend tariffs; it does not apply to the Commission's general discretionary authority to correct its legal errors. The NGA is silent as to the effect of a judicial invalidation of a FERC decision, and in the wake of that silence, the general principle of agency authority to implement judicial reversals explored in Callery, presumably applies.
 
 
 32
 Further, were we to accept petitioners' argument that the Callery principle applies only to refunds and not to surcharges, we would be undermining a long-recognized [296 U.S.App.D.C. 112] policy of the NGA to confer upon the pipelines the primary initiative in proposing appropriate rates for their services. See, e.g., ANR Pipeline Co. v. FERC, 771 F.2d 507, 513 (D.C.Cir.1985) (per curiam); Public Service Comm'n v. FERC, 642 F.2d 1335 (D.C.Cir.1980). We have emphasized many times that under § 4 of the NGA the FERC has no authority to affirmatively impose a rate; it must accept a pipeline's proposed rate unless it is found to be not just and reasonable. ANR Pipeline, 771 F.2d at 513. If the FERC were prohibited from ordering recoupment of losses caused by its error in refusing to accept a proposed rate, later determined to be just and reasonable, the pipeline's primary right under the NGA to propose and collect a justified rate would be drastically curtailed. And, if a successful appeal of an erroneous FERC decision against the pipeline could not be enforced retroactively, a pipeline's incentive to vindicate its rights under the NGA through judicial review would be similarly diminished. We do not believe Congress intended either result.
 
 
 33
 In fact, this court has already recognized that the FERC's predecessor agency had authority to order retroactive rate adjustments when its earlier order reversed on appeal improperly disallowed a higher rate. See Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 339 n. 8 (D.C.Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).[13] In a second case involving the Commission's improper denial of a proposed rate increase, this court also ordered an increase to take effect retroactively to the initial date on which it should have been allowed. See Boston Edison Co. v. FPC, 557 F.2d 845, 849 (D.C.Cir.1977); see also Iowa Power & Light Co. v. United States, 712 F.2d 1292, 1295-97 (8th Cir.1983) (sustaining Interstate Commerce Commission's authority to impose retroactive effective date for incorrectly rejected tariff). We have also been directed to several FERC decisions in which the Commission has routinely invoked its discretionary authority to correct errors resulting from orders overturned by a reviewing court. Thus, the Commission has ordered the retroactive recoupment of refunds that were found on judicial review to have been improperly ordered, see, e.g., Southern California Edison Co., 57 F.E.R.C. p 61,115 (1992); El Paso Natural Gas Co., 52 F.E.R.C. p 61,186 (1990); Southwestern Public Service Co., 48 F.E.R.C. p 61,156 (1989); Carolina Power and Light Co., 28 F.E.R.C. p 61,197 (1984). The FERC has also invoked its remedial authority to impose retroactive surcharges upon purchasers of pipeline transport service in order to allow the pipeline to collect a rate that was erroneously disallowed by the Commission. See, e.g., Sea Robin Pipeline Co., 48 F.E.R.C. p 61,335 (1989); Texas Eastern Transmission Corp., 25 F.E.R.C. p 61,469 (1983).[14] These judicial and administrative precedents, as well as the logic of the statute itself, strongly suggest that the Commission did not exceed its statutory authority, or act arbitrarily, capriciously, or not in accordance with law, by authorizing recoupment payments in this case.[15] Without such corrective power, pipelines would be substantially and irreparably injured by [296 U.S.App.D.C. 113] FERC errors, and judicial review would be powerless to protect them from much of the losses so incurred. Indeed, in periods when pipelines must make frequent rate filings to catch up with inflation, judicial protection might be a virtual nullity.
 
 2. Filed Rate Doctrine
 
 34
 Having determined that the FERC has authority to order retroactive surcharges to correct legal errors in appropriate circumstances, we now turn to the open-access shippers' claim that the exercise of that authority here violated the filed rate doctrine. As the Supreme Court has explained, that doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The filed rate doctrine is necessary, the Court said, for the "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." Id. at 577-78, 101 S.Ct. at 2930-31. Among other related purposes, we have identified the goals of avoiding discriminatory pricing, see Towns of Concord, Norwood, and Wellesley v. FERC, 955 F.2d 67, 71 (D.C.Cir.1992), and, most strongly urged here, rate predictability for buyers, see Columbia Gas Transmission Corp. v. FERC, 831 F.2d 1135, 1141 (D.C.Cir.1987) ("Columbia I " ).
 
 
 35
 Here, of course, the 16.88-cent rate the Commission ultimately allowed Tarpon to collect was stated in tariff sheets it filed on November 23, 1987 when it sought authority to provide open-access transportation. The Commission accepted the filings "subject to" the pending rate challenge, but then, after deciding against Tarpon, in March 1988 required it to file revised tariff sheets reflecting the 4.02-cent rate that the Commission had found just and reasonable. As counsel for the open-access shippers rightly acknowledged at oral argument, there could be no violation of the filed rate doctrine so long as users of Tarpon's service received adequate notice that the rate stated in Tarpon's 1987 filing might replace the Commission-ordered rate even for service originally provided under the latter. The filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service. As we said in Columbia Gas Transmission Corp. v. FERC, 895 F.2d 791 (D.C.Cir.1990), it is not that notice relieves the Commission of the bar on retroactive ratemaking, but that it "changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision." Id. at 797. See also Columbia I, 831 F.2d at 1140-41. Here we conclude that the open-access shippers had the necessary notice that they might end up paying the originally filed rate.
 
 
 36
 First, in its March 1988 Tariff Sheets Tarpon expressly reserved "the right to seek a surcharge to the rate in the event FERC Opinion No. 287, issued ... in docket No. RP84-82 et al. [rejecting the 16.88-cent rate] is overturned in [Tarpon v. FERC ]." See Order Denying Rehearing, 51 FERC p 61,310 at 62,028 n. 31 (emphasis added). Tarpon's ancillary filing with the Commission, its Request for Acceptance of Tariff Sheets, also made clear that the 4.02-cent rate was contingent on Tarpon's lack of success in its challenge to Commission Opinion No. 287: "The rates to be charged for transportation service under Rate Schedules FTS and ITS are set forth on the attached tariff sheets. Both the FTS and ITS rates will be subject to the outcome of Tarpon's general rate proceeding in Docket Nos. RP84-82-000 and RP84-82-001." Request for Acceptance of Tariff Sheets to Implement Order 436/500 Transportation Program, Joint Appendix ("J.A.") 449. Further, Tarpon's transportation agreements with its open-access shippers explicitly referred to its filed tariff sheets. See Tarpon Transmission Co., 51 FERC p 61,310 at 62,028 (1990).
 
 
 37
 [296 U.S.App.D.C. 114] The Commission's acceptance of Tarpon's rates explicitly acknowledged and accepted Tarpon's reservation:
 
 
 38
 Tarpon requests that the transportation rates proposed in the instant docket be subject to the outcome of ... Docket No. RP84-82.... We believe that the rates here should be subject to the outcome of that proceeding and, accordingly, will require that the rates proposed here be subject to the outcome of those proceedings.
 
 
 39
 Order Accepting Filing and Suspending Tariff Sheets, Subject to Refund and Conditions, and Convening Technical Conference, December 23, 1987, J.A. 537, 545. And further:
 
 
 40
 Tarpon's proposed tariff sheets ... are accepted for filing and suspended to become effective December 1, 1987, subject to refund, ... and subject to the outcome of the proceedings in Docket No. RP84-82.
 
 
 41
 Id. at 546 (emphasis added).
 
 
 42
 The open-access shippers urge several theories for the view that these documents did not establish notice for filed rate doctrine purposes. In general, their claim is that Tarpon's reservation of "the right to seek a surcharge", and that Tarpon's and the Commission's statements that the 4.02-cent rate was "subject to" the outcome of the litigation over Opinion No. 287, were too vague to alert them to the possibility of a surcharge on past shipments. The decision they invoke, however, City of Seattle v. FERC, 883 F.2d 1084 (D.C.Cir.1989), is only dimly related to the problem at hand. There FERC itself, as licensor of a hydroelectric project, was making a strained claim to authority to raise its annual license fee retroactively. All it had to go on was a phrase in an amendment to the license, made after enactment of the Federal Power Act, that the license was "subject to" the FPA, § 10(e) of which says that annual charges "may be adjusted from time to time by the Commission as conditions may require." 16 U.S.C. § 803(e)(1). Given § 6 of the FPA, which says that licenses might be altered "only upon mutual agreement between the licensee and the Commission after thirty days' public notice," id. at § 799, as well as the difficulty or impossibility of the licensee's passing a retroactive increase forward by virtue of the filed rate doctrine, the court found the reference inadequate to FERC's purpose. 883 F.2d at 1088-89. The decision plainly says little about the message conveyed by the language of the tariff sheets and Commission orders here, expressly making rates "subject to" the outcome of litigation in which Tarpon attacked the Commission's rate ceiling as unlawful. We note that the phrase "subject to" is precisely the one by which the Commission reserved the possibility of a refund to customers during the period that Tarpon's 16.88-cent rate was in effect. See supra at 110. Once it is recognized that the Commission may retroactively correct errors in both directions, as shown above, it seems inescapable that a provision making the current rate "subject to" the outcome in pending proceedings will also run both ways.
 
 
 43
 The open-access shippers also argue that in industry parlance the term "surcharge" denotes not a retroactively calculated add-on to current rates but rather a prospective increase of current rates.[16] This is a matter on which we would yield to any reasonable view of the expert Commission, but in any event the term has been used for retroactive collections made to redress the effect of Commission error. Thus in Kansas Gas & Electric Co., 43 FERC p 61,407 at 62,045 (1988), in a section captioned "Surcharges", the Commission said, citing several examples,
 
 
 44
 We have noted on several occasions that we have authority to require surcharges to make a company whole, and have in fact done so. Several courts have specifically stated that agencies have authority to require surcharges. Interest on the surcharges may also be required, since the purpose of the surcharges is to make the company whole.
 
 
 45
 [296 U.S.App.D.C. 115] Id. (emphasis added) (citing, among other authorities,United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965)).
 
 
 46
 In light of Tarpon's and the Commission's statements that the March 1988 filed rate was "subject to" the outcome of Tarpon's legal challenge, the Commission's authority to order retroactive collections to remedy Commission error, the Commission's past use of that authority, the Commission's use of the phrase "surcharge" to characterize its use of the authority, and Tarpon's express statement of intent to seek a surcharge in the event of vindication, we believe that the open-access shippers were on ample notice of the likelihood (if not the certainty) that if Tarpon succeeded in court (and before the Commission on remand), it would be free to collect the rate differential on past shipments. Thus we find no violation of the filed rate doctrine.
 
 Conclusion
 For the above reasons, the petitions are
 
 47
 Denied.
 
 
 
 *
 Judge Wald authored Parts I, II.A and II.B.1 and Judge Williams authored Part II.B.2
 
 
 [1]
 By contract, Trunkline originally reserved all of Tarpon's capacity for its own use. On March 31, 1988, however, Tarpon received a certificate of public convenience and necessity from the FERC that allowed Tarpon to provide open and non-discriminatory transportation ("open access shipping") on an "interruptible basis" to shippers other than Trunkline. Since that time Tarpon has provided open-access service to several marketeers, including petitioners Natural Gas Clearinghouse and Texican Natural Gas Company
 
 
 [2]
 Section 10.5 provides:
 Rate Adjustment. Trunkline or Tarpon, upon the giving of ninety (90) days written notice to the other prior to the end of the second, fourth, sixth, eighth, or tenth years of the primary term hereof, may request that the unit rate currently being utilized to determine the monthly charge and other charges or credits be decreased or increased to reflect changes in costs and/or gas reserves connected to the system. Such rate determinations shall be based upon a cost of service for the entire life of the reserves transported and to be transported pursuant to the Agreement and to other agreements Tarpon might enter into for the utilization of subject facilities, taking into consideration actual revenues collected to date or to be collected prior to the effective date of such unit charge; and such rate shall be calculated in the same manner as used in the calculation of the initial rate hereunder.
 
 
 [3]
 We summarized the gist of McGee's testimony in our earlier decision:
 McGee testified that the drafters of § 10.5 intended it to allow the parties to alter the terms of their relationship periodically so the agreement would approximate the arrangement they would have reached had they possessed perfect foresight in 1978. The parties realized that their initial estimates concerning costs were "not very firm"; thus, they constructed a method by which they could adjust the rates as new information became available.
 Tarpon, 860 F.2d at 443. As we noted, "the fact that the pipeline was originally intended only for the exploitation of a single set of reserves made the risks of misestimation acute." Id.
 
 
 [4]
 Under this interpretation, Tarpon recovers the same amount in undiscounted dollars that it would have recovered if the parties had been accurate in their initial estimates of the life-span of the total reserves. See Tarpon, 860 F.2d at 443. In economic effect, Tarpon's theory allows it to collect a greater proportion of the aggregate dollar amount in the early years of the pipeline's total lifetime. Tarpon thus gets the benefit of an interest-free loan on such accelerated errors. Had the estimation error been in the other direction, Trunkline would have been the beneficiary
 
 
 [5]
 Under the life-of-the-reserves depreciation methodology accepted as the correct interpretation of the Agreement, the pipeline's costs are recouped based on the estimated reserves of the system rather than the calendar years that those reserves are estimated to be in production. Thus, if 1,000,000 Mcf of production are anticipated over a ten-year period, the pipeline's rates will be calculated so that its capital investment will be fully recovered when 1,000,000 Mcf are transported without regard to whether that occurs in a shorter or longer period than the anticipated ten-year timeframe. This method, also known as the unit-of-production method, represents a significant departure from traditional ratemaking methods
 
 
 [6]
 See 18 C.F.R. § 154.63(e)(2) (1991)
 
 
 [7]
 The Commission also relied upon the testimony of Tarpon's witness Frank McGee, found to be credible by the ALJ. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). McGee was personally involved in the negotiation of the Agreement with Trunkline
 
 
 [8]
 Trunkline also argues that because the FERC's interpretation constitutes a departure from "traditional ratemaking principles," and because the result of the FERC's decision will be detrimental to consumers, this court should not uphold it. We have previously considered and rejected identical contentions, see Tarpon, 860 F.2d at 444
 
 
 [9]
 Under the FERC's open-access regulations, the actual rates parties may charge are quite flexible. The regulations require a one cent per Mcf minimum rate, and a maximum rate as established by the open-access proceeding. The open-access users may then negotiate with the pipeline, to the extent the market will bear, to use its services at a rate lower than the maximum rate
 
 
 [10]
 In its order discussing Tarpon's open-access rate filing, the Commission stated:
 Tarpon requests that the transportation rates proposed in the instant docket be subject to the outcome of its most recent section 4(e) general rate case filed in Docket No. RP84-82 [the Trunkline proceeding]. On October 20, 1987, the Commission issued an order [citing 41 F.E.R.C. p 61,044 (1987) (Opinion No. 287) ] addressing that filing, but the proceeding is still pending on rehearing. We believe that the rates here should be subject to the outcome of that proceeding and accordingly, will require that the rates proposed here be subject to the outcome of those proceedings.
 The Commission accepted Tarpon's open-access rate, ordering:
 (A) Tarpon's proposed tariff sheets which are identified in Appendix A of this order are accepted for filing and suspended to become effective December 1, 1987, subject to refund, subject to Tarpon's refiling within 15 days of the date of issuance of this order to make the revisions discussed in the body of this order, and subject to the outcome of the proceedings in Docket No. RP84-82.
 
 
 [11]
 Natural Gas Clearinghouse's total surcharge comes to $355,149, plus $25,841 in interest. Texican's total is $329,380, plus $42,972 in interest
 
 
 [12]
 Similarly, § 5(a) of the NGA grants the FERC asymmetrical authority--it may not on its own motion increase a filed rate, but it may lower a rate it finds on its own motion to be not "just and reasonable." See 15 U.S.C. § 717d(a)
 
 
 [13]
 The court on rehearing in Indiana & Michigan Electric vacated its retroactive rate adjustment order, see 502 F.2d at 344, based on the special circumstances that the regulated buyers were prevented by statute from passing the increased costs on to their customers
 
 
 [14]
 Petitioners contend that these FERC decisions are inapposite because the parties involved had meanwhile entered into agreements that contemplated possible recoupment through retroactive surcharges. See also Kansas Gas & Electric Co., 43 F.E.R.C. p 61,407 (1988). We nonetheless find the Commission's assertion of its retroactive corrective authority in these decisions to be indicative of a longstanding practice and policy on the part of the Commission to impose such surcharges
 
 
 [15]
 We also reject petitioners' contention that the FERC failed to engage in reasoned decisionmaking when it approved the linkage between the open-access rate and the rate determined in the Trunkline general rate proceeding. Natural Gas Clearinghouse and Texican allege that the rate design in § 10.5 contravenes the FERC's open-access regulations, and that the FERC failed to adequately explain its departure from the regulations when it linked the open-access rate to the Trunkline rate. The Commission's decision to condition the open-access rates on the outcome of the Trunkline proceeding was made in a very early phase of the open-access docket. Any objections to the Commission's linkage of the open-access rate to the Trunkline case should have been made at that time. After knowingly accepting service under the terms of the open-access rate filing, Natural Gas Clearinghouse's and Texican's belated complaint amounts basically to an impermissible collateral attack upon that earlier decision
 
 
 [16]
 We note again that the issue boils down to one of notice, so that the open-access shippers' other notice arguments do not warrant separate treatment, e.g., the argument that unilateral waivers of the filed rate doctrine are not allowed. See Brief for Petitioners Natural Gas Clearinghouse and Texican Natural Gas Company at 22-23